MISCELLANEOUS SERVICE WORK-
ERS, DRIVERS & HELPERS, TEAM-
STERS LOCAL # 427, Plaintiff,

and

Roger T. Ábe, et al.,
Plaintiffs-Appellants,

v.

PHILCO–FORD CORPORATION, WDL
DIVISION, formerly known as Aeronu-
tronic Ford Corporation, and now
known as Ford Aerospace & Communi-
cations Corporation, Defendant-Appel-
lee.

No. 78–1506.

United States Court of Appeals,
Ninth Circuit.

Submitted June 11, 1980.

Decided Nov. 16, 1981.

Lawrence I. Weisman, Honolulu, Hawaii, for plaintiffs-appellants.

Jared H. Jossem, Torkildson, Katz, Jossem & Loden, Honolulu, Hawaii, for defendant-appellee.

Before KENNEDY and HUG, Circuit Judges, and WILLIAMS *, District Judge.

SPENCER WILLIAMS, District Judge:

The primary issue in this case is whether the Service Contract Act of 1965, as amended, 41 U.S.C. § 351 *et seq.*, permits the employees of a successor contractor to a government service contract to maintain a private right of action under the Act against their employer for alleged violations of the Act. The secondary issues concern alleged fraud and a pendent state wage and hour claim.

## I. PROCEDURAL AND FACTUAL BACKGROUND

Plaintiffs-appellants are former employees of Lockheed Missile and Space Company ("Lockheed") who worked at the United States Government's Kaena Point Missile Tracking Station, and became employees of defendant-appellees Aeronutronic Ford Corporation ("AFC") upon succession to Air Force contract for operation of the Kaena Point station in 1972.[1]

Plaintiffs allege three basic causes of action against AFC: (1) for violations of the Service Contract Act of 1965 ("SCA"), as amended, 41 U.S.C. § 351 *et seq.*, in failing to compensate plaintiffs at prevailing wage and fringe benefit levels under their previous contract with Lockheed; (2) for deceit and misrepresentation in falsely advising plaintiffs that the SCA did not apply to their contract; and (3) for violating statutory provisions of the Hawaii Wage and Hour Law, Haw.Rev.Stat. Chapters 387 & 388, in failing to pay fringe benefits due plaintiffs. The district court granted summary judgment in favor of AFC with respect to the first claim on the grounds that the SCA, as originally enacted, did not create a private cause of action against employers who violate the Act. The second claim was dismissed for failure to plead with particularity in accordance with Rule 9, Fed.R.Civ.P. The third claim was dismissed for failure to state a claim as required by Rule 12(b)(6), Fed.R.Civ.P. This appeal followed, and we affirm.

The missile tracking stations at Kaena Point, Hawaii and Kodiak, Alaska were operated by Lockheed under an Air Force contract prior to 1971. In May 1971, AFC was awarded the contract to staff and operate these tracking stations. However, an intervening legal dispute,[2] unrelated to the

---

1. Plaintiffs were joined by those employees who worked in a similar installation in Kodiak, Alaska. Lockheed and the International Association of Machinists ("IAM") were also defendants in the suit below. The claims against them were dismissed by the district court and no appeals were taken.

2. An injunction was obtained by the unsuccessful low bidder on the contract, General Electric ("G.E."), preventing AFC from completing its phase-in at Kaena Point from March 7, 1972 to October 12, 1972. *See General Electric Co. v. Seamans*, 340 F.Supp. 636 (D.C.1972) (AFC was awarded the contract—despite G.E.'s low-

instant action, prevented AFC from assuming responsibility for operation of the stations, and Lockheed continued to operate the stations on a "month-to-month" basis on October 30, 1972.[3] After November 1972, AFC assumed full responsibility for maintenance and operation from Lockheed.

Concurrent with AFC's assumption of its duties under the Air Force contract, various labor organizations, including plaintiff, began negotiating with AFC over collective bargaining rights for the service employees of the tracking stations. The vast majority of AFC's employees were former Lockheed employees who opted to go to work for the successor contractor, AFC. While negotiations were ongoing in May 1973, "Wage and Hour Poster No. 1313" was posted at AFC's premises advising the station employees of certain rights under both the Walsh-Healey Act[4] and the SCA. The poster did not inform them which act governed their contract. The negotiations culminated in a collective bargaining agreement between AFC and the union on July 24, 1973. Plaintiffs concede that all wages, hours, and conditions of employment were set forth fully in that collective bargaining agreement. The AFC fringe benefit program as finally memorialized in the collective bargaining agreement varied somewhat from that of Lockheed.[5]

## II. THE SERVICE CONTRACT ACT

Section 2 of the Service Contract Act requires the inclusion of specific provisions establishing minimum wage and fringe benefit levels in every contract entered into by the United States in excess of $2,500[6] "the principal purpose of which is to furnish services in the United States through the use of service employees." 41 U.S.C. § 351(a). A contract subject to the SCA must contain, for example, "a provision specifying the *fringe benefits to be furnished* the various classes of service employees..." 41 U.S.C. § 351(a)(2). This wage and fringe benefit determination is explicitly directed to the responsibility of the Secretary of Labor "in accordance with prevailing rates for such employees in the locality, or *where a collective bargaining agreement covers any such service employees, in accordance with the rates for such employees provided for in such agreement* ..." 41 U.S.C. § 351(a)(1) (emphasis added).

In 1972, Congress, dissatisfied with the Secretary of Labor's inconsistent administration of the Act, amended the Act to strengthen enforcement of congressional objectives: "To provide assurance that employees working for service contractors under a collective bargaining agreement will have wages and fringe benefits under a new service contract no lower than those

er bid—because the procurement authority felt that G.E.'s bid was so low as to be "unrealistically low.") Both AFC and the Air Force opposed G.E.'s preliminary injunction. Although this Court need not reach this issue, it seems clear that AFC's contract with the Air Force for operation of the missile tracking stations became a legally binding obligation in May of 1971—when it was awarded—and not after the dissolution of G.E.'s injunction as appellants argue.

**3.** The injunction precluding AFC's operation of the stations dissolved on October 12, 1972 with the General Accounting Office's denial of G.E.'s claim.

**4.** 41 U.S.C. §§ 35–45. Federal *supply contracts* are the object of the protective provisions of the Walsh-Healey Public Contracts Act. The Act applies to all federal supply contracts for both new and used material and equipment in

excess of $10,000. The statute requires, *inter alia*, contractors to pay certain minimum wage and overtime benefits to their employees. While the Act bears certain similarities to the Service Contract Act, its application in the given circumstances seems inappropriate because the AFC contract with the Air Force involved only the provision of service laborers, not supply materials.

**5.** Specifically, plaintiffs contend that AFC in refusing to recognize certain seniority rights under the former contract altered entitlements to pension benefits enjoyed under the Lockheed contract. Because we dispose of this claim on jurisdictional grounds, we need not reach this issue.

**6.** 41 U.S.C. § 356 (with certain exceptions not applicable here).

under their current agreement."[7] One addition, subsection, § 4(c), prohibits a successor contractor from paying service employees less than the wages and fringe benefits to which they would have been entitled under a predecessor's contract. The new subsection provides:

> (c) *No contractor or subcontractor under a contract, which succeeds a contract subject to this chapter and under which substantially the same service are furnished, shall pay any service employee under such contract less than the wages and fringe benefits, including accrued wages and fringe benefits,* and any prospective increases in wages and fringe benefits provided for in a collective-bargaining agreement as a result of arm's length negotiations, *to which such service employees would have been entitled if they were employed under the predecessor contract* : Provided, That in any of the foregoing circumstances such obligations shall not apply if the Secretary finds after a hearing in accordance with regulations adopted by the Secretary that such wages and fringe benefits are substantially at variance with those which prevail for services of a character similar in the locality. 41 U.S.C. § 353(c) (emphasis added).

## III. *PRIVATE RIGHT OF ACTION*

The main thrust of plaintiffs' claim is: (1) the SCA applies to the Air Force contracts here in question, and (2) in consequence, AFC violated § 4(c) of the Act by refusing to recognize certain seniority rights held by plaintiffs by virtue of their previous employment with Lockheed, thereby altering their entitlement to pension benefits. Pension benefits, it is clear, are "fringe benefits" under the Act. *See* 41 U.S.C. § 351(a)(2).

The district court held that plaintiffs had no standing under the SCA, as originally enacted, to institute a private action for violations of the Act by their employer. We agree. Plaintiffs now are attempting to argue that the 1972 amendments[8] created such a private right of action, and with that, we disagree. The Act does not specifically grant a private right of action, and nothing in its language or history compels us to believe that such a right may be implied. On the contrary a plain reading of the statute evidences a clear legislative intent to restrict employee remedies under the Act to administrative channels. Section 3(a) provides that the government contracting agency may withhold such sums, *as the Secretary of Labor deems necessary to compensate employees for violations of the Act,* from amounts otherwise accrued on the service contract. 41 U.S.C. § 352(a). Subsection 3(b) provides either the Secretary of Labor or the agency head with authority to carry out the withholding remedy under the Act. 41 U.S.C. § 352(b). Alternatively, the United States may cancel a contract found to be in violation of the Act. 41 U.S.C. § 352(c). Violators of the SCA can be placed on blacklists circulated by the Comptroller General which would preclude their being awarded any further government contracts in a three-year period. 41 U.S.C. § 354(a). Finally, section 5(b) authorizes a limited governmental cause of action for underpayment:

> (b) *If the accrued payments withheld* under the terms of the contract are insufficient to reimburse all service employees with respect to whom there has been a failure to pay the compensation required pursuant to this chapter, *the United*

7. Senate Report No. 92–1131, 1972 U.S.Code Cong. & Adm.News 3534.

8. Act of Oct. 9, 1972; Pub.L.No.92–473, § 3, 86 Stat. 789. We need not decide whether AFC's contract antedated the effective date of the '72 amendments, and if so, whether the private right of action purportedly created therein can be applied retroactively to contracts entered into prior to October 12, 1972 (the effective date of the amendments). We do hold that AFC had a valid contract with the U. S. Air Force in May 1971, and that said contract was properly subject to the SCA of 1965. Because we hold below, *infra*, that the Act, as amended in 1972, still does not provide for private enforcement of employees rights by suits against their employers, the question is moot. Under either version of the Act (pre- or post-1972) plaintiffs have no standing.

*States may bring action against the contractor, subcontractor, or any sureties in any court of competent jurisdiction to recover the remaining amount of underpayments.* Any sums thus recovered by the United States shall be held in the deposit fund and shall be paid, on order of the Secretary, directly to the underpaid employee or employees. Any sum not paid to an employee because of inability to do so within three years shall be covered into the Treasury of the United States as miscellaneous receipts. 41 U.S.C. § 354(b) (emphasis added).

The government has a contingent right to institute suit, but may do so only after first applying the prescribed administrative remedies, and then *only if* "the accrued payments withheld . . . are insufficient to reimburse all service employees with respect to whom there has been a failure to pay the compensation required by this chapter." *Id.*

█ The question whether a private right of action is conferred by a federal statute is essentially one of interpreting congressional intent. *Middlesex County Sewerage Authority v. National Sea Clammers Ass'n,* —— U.S. ——, 101 S.Ct. 2615, 69 L.Ed.2d 435 (1981). That inquiry is facilitated by applying the fourfold test announced in *Cort v. Ash,* 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1972). The test is: (1) Is the plaintiff "one of a class for whose especial benefit the statute was created?" [9] (2) Is there any indication of a legislative intent to fashion such a remedy? (3) Is it consistent with the underlying legislative scheme to imply such a remedy? (4) Is the cause of action one traditionally relegated to state law, so that an implied federal cause of action would be inappropriate?

Regarding the first test, it is clear that plaintiffs are indeed members of a class for whose especial benefit the statute was passed and later amended. The legislative history of the 1972 amendments evinces a special solicitude for persons precisely in

plaintiffs' shoes—employees providing service work under government contracts.[10]

Turning to the legislative history, however, it is apparent that nothing supports an inference of a legislative intent to create private remedies under the Act. Plaintiffs confuse an intention to confer rights— which Congress does repeatedly through legislation—with the specification of remedies for the protection of those rights. The plain language of the statute, as well as the legislative history, supports a contrary view; namely, that Congress intended to provide for exclusive administrative enforcement of the SCA. The primary purpose underlying the 1972 amendments was "to bring about more equitable and more efficient *administration*" of the SCA by narrowing the Secretary's discretion in deciding whether to issue a wage determination for all government service contracts. *See* Senate Report No. 92–1131, 1972 U.S. Code Cong. & Adm.News, p. 3534–3535. This view of the legislative intent is supported by the closing comment of the Senate Report:

It is the sense of the committee that the Secretary should draft regulations providing for expeditious hearings and decisions. Clearly, *contractual wages and fringe benefits shall continue to be honored in the foregoing [successorship] circumstances, unless and until the Secretary finds, after a hearing,* that such wages and fringe benefits are substantially at variance with those prevailing in the locality for like services.

*Id.,* at 3538 (emphasis added).

█ Third, it would be flatly inconsistent with the express provision of a limited governmental cause of action to imply a wide ranging private right of action as an alternative to a government suit. As noted above, the legislative scheme inherent in the Act envisions a comprehensive administrative rubric for the protection of federal service workers. Where Congress has es-

**9.** 422 U.S. at 78, 95 S.Ct. at 2087 (citations omitted).

**10.** Senate Report No. 92–1131, 92 Cong.2d Sess. 5, 1972 U.S.Code Cong. & Adm.News, p. 3534–3538.

tablished a regulatory scheme, the specification thereof normally excludes duplicative judicial jurisdiction. *Switchmen's Union of North America v. National Mediation Board*, 320 U.S. 297, 64 S.Ct. 95, 88 L.Ed. 61 (1943). As the Supreme Court observed in *Switchmen's Union* :

> Congress for reasons of its own decided upon the method for the protection of the "right" which it created. It selected the precise machinery and fashioned the tool which it deemed suited to that end . . . . [I]t is for Congress to decide how the rights it creates shall be enforced.

320 U.S. at 301, 64 S.Ct. at 97.

To imply a private right of action under this statute would undercut the specific remedy prescribed by Congress; what plaintiff will pursue his administrative remedies under the Act where more direct and expeditious relief is available in a private suit?

Finally, notwithstanding the plain language of the statute and the adverse implications of the legislative history, the available authority also militates against finding an implied private right of action under the SCA.

Under similar circumstances, the District of Columbia Circuit Court of Appeals has refused to imply a private remedy under the SCA.[11] In *Machinists v. Hodgson*, 515 F.2d 373 (D.C.Cir.1975), a labor union sought, *inter alia*, damages from a government contractor for violations of the SCA where a wage determination by the Secretary had never been issued. The Court of Appeals noted that plaintiff sought damages from the contractor for omissions which were the responsibility of the Secretary of Labor. The court held that the

statute simply would not sustain a private right of action:

> [I]t is the Secretary of Labor who allegedly acted wrongfully in omitting the wage determination. Boeing [the contractor] was entitled to bid on the specifications as it found them . . . . The resulting contract is valid as between Boeing and the United States despite the lack of a wage determination provision . . . . The issue here is whether the Service Contract Act provides any means by which the Unions can recover damages from Boeing. The Court finds nothing within the Act that would support what the Union has described as "vindication" . . . . *[T]he Act does not provide any remedy against employers for the alleged omissions of the Secretary of Labor.*[12]

The prevailing view is against implications of such private causes of action *except* where ineluctable inferences arise from the Act to compel such a finding.[13] As the Supreme Court admonished in *National Railroad Passenger Corp. v. National Association of Railroad Passengers*, 414 U.S. 453, 458, 94 S.Ct. 690, 693, 38 L.Ed.2d 646 (1974):

> A frequently stated principle of statutory construction is that when a legislature expressly provides a particular remedy or remedies, courts should not expand the coverage of the statute to subsume other remedies.

In sum, the joint application of the *Cort* criteria and our analysis of the legislative history to the SCA compels the conclusion that Congress did not intend for private suits to enforce the Act, but rather established exclusive administrative enforcement by the Secretary of Labor. The redress of plaintiffs' grievances lay with the Secretary and not in the courts.

---

11. While the Court's holding narrowly applied only to the 1965 Act prior to the 1972 amendments, the Court noted that the purpose of the '72 amendments was to "further restrict . . . the Secretary of Labor's discretion not to issue a wage determination . . . . *[T]he 1972 amendments do not create new remedies against contractors.*" 515 F.2d at 379, n.9 (emphasis added).

12. 515 F.2d at 378–379 (emphasis added). *Accord; Dodd v. Blackstone Cleaners, Inc.*, 61

CCH Labor Cases ¶ 32,281 (N.D.Tex.1969); *Service Employees' International, Local No. 36 v. General Services Administration*, 443 F.Supp. 575, 580 (E.D.Pa.1977) (denying plaintiff's claim for damages as the "Act simply does not provide for such a remedy").

13. *See City of Rohnert Park v. Harris*, 601 F.2d 1040, 1045–47 (9th Cir. 1979) (Ninth Circuit declining to imply private right of action under the Housing Act of 1949).

## IV. DECEIT–MISREPRESENTATION CLAIM

Count XIII was dismissed by the district court because plaintiffs failed to comply with Rule 9,[14] Fed.R.Civ.P. In alleging a fraudulent misrepresentation by unnamed members of AFC's management, plaintiffs failed to plead with particularity the manner and circumstances of the asserted misrepresentation.

The complaint apparently alleges two separate instances of misrepresentation: (1) that AFC knew of the posting requirements under the SCA, but deliberately violated said provisions by failing to post notices informing its employees of their rights under the Act,[15] and (2) "Philco [AFC] further deliberately misled plaintiffs through verbal representations by station managers and management to the effect that employee rights guaranteed under the Service Contract Act ... were not available to them. *This caused plaintiffs to fail to assert claims against Philco ... under the Act.*"

Rule 9 requires a plaintiff averring fraud (or deceit) to state "the circumstances constituting [such] fraud" with "particularity". This has been interpreted to mean the pleader must state the time, place and specific content of the false representations as well as the identities of the parties to the misrepresentation.[16]

■ Here, the complaint runs afoul of Rule 9. The manner, content or medium of the alleged misrepresentations is not speci-fied. Moreover, from the face of the complaint it appears that plaintiffs were not damaged by the alleged misrepresentation because plaintiffs´ did not have a private right of action against AFC under the Act. On appeal, plaintiffs have altered their position, arguing that by virtue of their deception they forebore exercise of their rights against the Air Force under the Tort Claims Act, 28 U.S.C. §§ 2671–2680, for negligent failure to incorporate the SCA into the AFC contract. We express no opinion whether plaintiffs had a valid cause of action against the Air Force which later became time barred by the statute of limitations, except to note that the complaint fails to specify what damages were sustained by reason of the alleged AFC misrepresentations. Accordingly, the district court's dismissal of this count under Rule 9 must be affirmed.

## V. HAWAII WAGE & HOUR LAW CLAIMS

Finally, plaintiffs argue ´that their state claim [17] against AFC arising out of the Hawaii Wage & Hour Law survives the district court's dismissal under Rule 12(b)(6), Fed.R.Civ.P., for failure to state a claim upon which relief can be granted.

We disagree. In Count XVI plaintiffs, insofar as that count can be comprehended, appear to be advancing the argument that because AFC did not agree in their collective bargaining agreement to pay fringe benefits identical to those contained in the

---

14. Rule 9, Fed.R.Civ.P., provides:

(a) * * *

(b) *Fraud, mistake or condition of mind.* In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge and other condition of mind may be averred generally.

15. Paragraphs 98 & 99 do not state a cause of action for deceit or fraud as between two parties at arms length. Defendants have no "duty of disclosure" except in instances where a fiduciary duty serves to bind the defendant and the party to whom the law directs full disclosure shall be made. *See Affiliated Ute Citizens v. United States,* 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972).

In any event, the district court made an express finding that the required notices were in fact posted. Indeed, plaintiff's own affiant admitted seeing the required notices posted in 1973 on the job site. We hold that the first allegation of deceit in XIII was properly dismissed.

16. *See Gottreich v. San Francisco Investment Corp.,* 552 F.2d 866 (9th Cir. 1977); *Poloron Products v. Lybrand Ross Bros. & Montgomery,* 72 F.R.D. 556 (S.D.N.Y.1976).

17. Diversity jurisdiction exists pursuant to 28 U.S.C. § 1332 for independent federal jurisdiction over the state law claims.

Lockheed contract, AFC has been "willfully withholding" wages and compensation legally due plaintiffs. If so, this is a violation of the Hawaii Wage & Hour Law, Haw. Rev.Stat., Chapters 387 & 388, which prohibit the wrongful retention of "any compensation earned by any employee . . . ."[18] The statute, *unlike the SCA*, provides for private actions by employees to "recover unpaid wages."[19]

■ We agree with the district court that this count simply fails to state a claim in that "there was no allegation of the willful withholding of anything [legally due plaintiffs]." Plaintiffs entirely misconstrue the purpose of Chapters 387 & 388, which serve to prevent the employer from withholding sums or benefits to which the employee has rights by *virtue of his contract with his employer*, not a predecessor. Accordingly, we hold this count was properly dismissed.

For the reasons stated above we affirm the decision of the district court.